IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| JENNIFER WELLS-MARSHALL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:22-cv-00086-RAH |
| ) | [WO] |
| AUBURN UNIVERSITY, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

**I.   INTRODUCTION**

Plaintiff Dr. Jennifer Wells-Marshall was reprimanded, had her duties removed, and later had her employment contract non-renewed. Wells-Marshall now sues Auburn University and Dr. Angela Wiley, Wells-Marshall's supervisor, alleging violations of Title VII and 42 U.S.C. § 1981, respectively. Before the Court is the Defendants' Motion for Summary Judgment. The motion is ripe for resolution. For the following reasons, the motion is due to be GRANTED.

**II.   JURISDICTION AND VENUE**

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested, and venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

**III.   STANDARD OF REVIEW**

Summary judgment is proper if there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). *See also* Fed. R. Civ. P. 56(a). The moving party "always bears the initial responsibility of informing the

1

district court of the basis for its motion," and should rely on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324. Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

## IV.  BACKGROUND

Wells-Marshall is a black female who served as executive director of the Family Child Care Partnerships (FCCP) at Auburn University. The FCCP program is administered through the College of Human Sciences' Human Development and Family Science Department (HDFS), of which Defendant Dr. Angela Wiley is the head. The FCCP program is funded through grants from the Alabama Department of Human Resources (DHR), a state agency unaffiliated with Auburn. (Doc. 46-8 at 14:20–15:19.)[1] The program also includes the Early Head Start-Family Child Care Partnership (EHS) program.

---

[1] Documents generally will be referenced by their CM/ECF page number and not internal document page numbers. But for the sake of clarity, the Court will cite to internal page numbers for deposition citations.

Pertinent to this case, as department head, Wiley supervised tenure-track and non-tenure-track faculty, including the FCCP director. (*Id.* at 11:17–20, 14:12–19.) She served as Wells-Marshall's direct supervisor during her stint as executive director of the FCCP program. Wiley, in turn, reported to Dean Susan Hubbard. (*Id.* at 19:12–20.)

At the time pertinent to this lawsuit, the FCCP director was "tasked with the direction and administrative oversight of two multifaceted, multimillion dollar efforts to increase the quality of early childhood care: the [FCCP] program and the Early Head Start-Family Child Care Partnership program." (Doc. 43-1 at 127.) This included "maintaining healthy working relationships with the program funder[]"—DHR. (*Id.*)

### A. The FCCP Program Prior to Wells-Marshall's Leadership

When Wiley became department head in 2017, the FCCP director was Elaine Miller, a white female. (Doc. 46-8 at 16:9–23, 21:1–5.) Miller was never counseled or otherwise formally disciplined during her time as FCCP director. (*Id.* at 19:21–20:1.) Likewise, DHR never indicated to Wiley that Miller's leadership or communication skills were lacking or problematic, nor did DHR express any concerns about the FCCP program or the program's contract compliance while the program was under Miller's direction. (*Id.* at 20:2–23, 39:20–40:4; Doc. 46-7 at ¶¶ 7–8.) Miller voluntarily resigned from her position on December 31, 2018 following an investigation into a potential conflict-of-interest violation involving her daughter but before any disciplinary action was taken. (Doc. 46-7 at ¶ 9.) Following the resignation, Wiley served as interim FCCP director while Auburn conducted a search for a new director. (*Id.* at ¶ 11.)

### B. Wells-Marshall's Leadership

In May 2019, Wells-Marshall was selected as the next FCCP director. At the time Wells-Marshall was hired, Auburn previously had lost the education

3

component of the Early Head Start contract for noncompliance reasons. (Doc. 47-3 at ¶¶ 6(B)(a), 6(D)(b).) Wells-Marshall contends that HDFS under Wiley had lost funding from DHR and "was plagued with financial, employee, and programmatic issues." (Doc. 47-3 at ¶ 6(A)(e); Doc. 43-1 at 147:9–17.)

### 1. Wells-Marshall's Communication Problems with FCCP Staff and DHR

After a year in the new position, Wiley provided Wells-Marshall with a written performance evaluation for her first year as executive director. (Doc. 46-2 at 139:14–140:17.) In it, Wiley praised Wells-Marshall for several achievements, including improving contract compliance and working with Central Auburn HR to adjust FCCP staff compensation to the current market rate. (Doc. 43-1 at 173–74.) Wiley however cautioned that Wells-Marshall needed to adjust her "brusque and blunt" leadership style to better communicate with FCCP staff and DHR leadership. (*Id.* at 174–75.) This caution came from feedback from FCCP employees and DHR. (Doc. 46-8 at 77:17–78:18.) Still, Wells-Marshall received a performance rating of "exceeds expectations." (Doc. 43-1 at 175.)

Issues involving Wells-Marshall's communication style nevertheless continued. Six to eight FCCP staff complained to Wiley or Human Resources Liaison (HRL) Leanne Marshall about Wells-Marshall's communication style and lack of responsiveness to emails and other work-related communications. (Doc. 46-8 at 86:8–87:17; Doc. 46-7 at ¶ 17; *see also* Doc. 43-3 at ¶¶ 17–21; *Id.* at 24–54 (email correspondence between HRL Marshall and various FCCP staff).) FCCP staff also reported that Wells-Marshall had a pattern of non-responsiveness to their emails, made "rude and abrupt comments, [was] speaking over people, [and] not allowing [FCCP staff] to say what they needed to say." (Doc. 46-8 at 90:19–91:1.) Of the complainants, two-thirds were white and one-third were black. (*Id.* at 127:16–129:18; Doc. 43-3 at ¶¶ 17–22.)

### a. The June 2020 Meeting with DHR Leadership

In early June 2020, Wells-Marshall and Wiley met and discussed how Wells-Marshall could continue to grow the FCCP program, focusing on staffing issues under the EHS grant. (Doc. 43-1 at 213:10–215:5; *Id.* at 181.) Wiley also reminded Wells-Marshall to "commit to respond[] to emails for approvals, directions or support in a timely way" to FCCP staff and to "work to temper your feedback and communication to be constructive while still being appropriately professional as needed." (*Id.* at 182.) Wells-Marshall acknowledged in an email after the meeting that her leadership style was not working with her staff. (*Id.* at 181.)

Sometime after the meeting, Bernard Houston, a DHR administrator, called Wiley to discuss "major concerns" with Wells-Marshall's leadership and asked for Wiley, Wells-Marshall, himself, and other DHR Leadership[2] to meet to discuss these issues. According to Wiley, Houston was concerned about how Wells-Marshall's "communication patterns were becoming untenable from DHR's perspective for working with them as an agency and leading the contract." (Doc. 43-2 at 81:21–85:3.) According to Myra Davis, a member of the DHR Leadership team, Wells-Marshall's behavior was unacceptable and she was "not responsive in a timely way and was unprofessional and rude." (*Id.* at 85:4–15.)

On June 26, 2020, Wiley, Wells-Marshall, and DHR Leadership met and discussed Wells-Marshall's communication issues from DHR's standpoint. (Doc. 43-2 at 97:4–11.) DHR Leadership also criticized Wells-Marshall for "asking too many questions and not just doing as [she was] told." (Doc. 43-1 at 230:20–23.) From Wells-Marshall's perspective, the meeting was less about her communication

---

[2] DHR Leadership included Houston, a black male, who served as an administrator of the Child Care Services & Workplace Development division; Jennifer Connell, a white female, who served as the Division Director for the Child Care Services Division; and Myra Davis, a black female, who served as the EHS manager. (Doc. 43-1 at 229:1–22.)

5

style and leadership of the FCCP program, and more about the on-going noncompliance issues. (*Id.* at 230:12–231:19.)

DHR Leadership gave Wiley and Wells-Marshall thirty days to correct the non-compliance issues and to make significant improvements in communications between "Auburn EHS-CCP leadership," which included Wells-Marshall, and DHR. (*Id.* at 236:2–237:9; *Id.* at 186–187; Doc. 43-2 at 102:8–18.) DHR Leadership also stated that if these issues were not satisfactorily addressed, DHR would issue a notice of intent to cure, which could lead to the cancellation of the FCCP grants to Auburn. (Doc. 43-1 at 247:3–14; Doc. 43-2 at 98:6–100:20, 153:18–155:1; Doc. 43-3 at ¶ 36.)

### b. DHR Leadership's Continuing Concerns with Wells-Marshall

According to Wells-Marshall, she felt that her task was to correct noncompliance issues and that she was hampered in doing so because the FCCP staff had been "coddled" and had not been held accountable for their performance issues. (Doc. 43-1 at 143:15–144:13, 153:15–155:9.) While Wells-Marshall did address some of DHR Leadership's concerns, she did not, from DHR Leadership's perspective, significantly improve her communication or professionalism. (Doc. 43-2 at 103:10–104:19, 125:18–127:11.)

After the thirty-day deadline passed, DHR Leadership asked Wiley to meet with them again, this time without Wells-Marshall. (*Id.* at 105:3–16.) In this meeting, DHR Leadership expressed that they were not "satisfied" with Wells-Marshall's progress and reiterated that their largest concern—communication, attitude, and responsivity—had not significantly improved. (*Id.* at 103:10–104:5.)

On August 5, 2020, DHR's Connell contacted Wells-Marshall and Wiley "to address a concern with [Wells-Marshall] regarding following directives from DHR and collaboration with partners." (Doc. 43-1 at 269:23–270:23; *Id.* at 208–09.)

6

From DHR Leadership's perspective, Wells-Marshall had again continued her pattern of not following DHR directives. (*Id.* at 208–09.)

A week later, Wiley provided Wells-Marshall with a corrective action plan to improve her performance. (*Id.* at 273:13–274:20; *Id.* at 210–11.) In this plan, Wells-Marshall was given various directives, including timely submitting receipts to the funder, meeting the objectives that DHR set, and improving her communication style. As stated by Wiley, "Every communication . . . must be courteous. I have had multiple reports of phone and ZOOM conversations that have featured angry responses, talking over people and refusing to allow the other party to finish their sentences. . . . I have heard from multiple [DHR] staff that your manner is at least as important as the actual tasks that need to be done. The contract is at stake; other contracts are at stake; Auburn's reputation is at risk." (*Id.* at 210; *see also* Doc. 43-2 at 119:12–14, 120:16–122:4; Doc. 43-3 at ¶¶ 38–39; Doc. 43-4 at 83–86.) This was the third occasion since April 2020 that Wiley had directed Wells-Marshall to improve her communications with DHR and FCCP staff. (Doc. 43-1 at 286:12–287:19; Doc. 43-1 at 212–14; Doc. 43-3 at ¶ 40.)

### 2. Wells-Marshall's Reassignment and Non-Renewal

In late September, following a weekly call by Wells-Marshall with DHR, Connell again told Wiley that Wells-Marshall's conduct was unprofessional, stating that her "tone was uncourteous and unprofessional." (Doc. 43-1 at 215.) Wiley and HRL Leanne Marshall then met with Wells-Marshall again to "document[] [Wiley's] serious concerns regarding [Wells-Marshall's] performance." (Doc. 46-2 at 300:22–301:23; Doc. 43-1 at 218; Doc. 43-2 at 130:20–140:11; Doc. 43-3 at ¶ 42; Doc. 43-4 at 93–96.) This meeting constituted a formal reprimand under Auburn's progressive discipline policy. (Doc. 43-3 at ¶ 42; Doc. 43-4 at 93–96.)

Before this meeting, Wiley and HRL Marshall contacted the Provost's Office to inquire about non-renewing Wells-Marshall's employment contract. (Doc. 43-3

7

at ¶¶ 38–41; Doc. 43-4 at 88–91.) After consultation with then-Associate Provost for Faculty Affairs Dr. Emmett Winn, Wiley and Dean Susan Hubbard recommended that Wells-Marshall's duties be reassigned for the remainder of her contract and that her contract not be renewed. (Doc. 43-3 at ¶ 41; Doc. 43-4 at 88–91; Doc. 43-2 at 149:6–151:14.)

On October 22, 2020, Dean Hubbard sent Wells-Marshall a memorandum informing her that, effective immediately, her duties were being reassigned, that she would no longer serve as the FCCP director, and that her contract would not be renewed. (Doc. 46-2 at 310:11–312:20; Doc 43-1 at 232.) The next day, Wiley emailed Wells-Marshall to inform her that she would also transition to teaching four courses in the College during the Spring 2021 term. (Doc. 46-2 at 319:17–321:15; Doc 43-1 at 234; Doc. 43-3 at ¶ 43.) Despite these changes, Wells-Marshall continued to receive the same pay and benefits through the end of her contract.

Wells-Marshall filed a charge of discrimination with the EEOC on April 20, 2021, shortly before her contract ended on May 31, 2021.

## V.   DISCUSSION

Title VII prohibits employers from discharging an employee, or otherwise discriminating against that employee with respect to the employee's terms, conditions or privileges of employment "because of" that person's race. 42 U.S.C. § 2000e-2(a)(1). Section 1981 likewise forbids employers from intentionally discriminating against employees based on their race. *See Webster v. Fulton Cnty.*, 283 F.3d 1254, 1256 (11th Cir. 2002). A plaintiff may present either direct evidence, circumstantial evidence, or both, to support a race discrimination claim. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023). The Defendants have moved for summary on Wells-Marshall's claims brought under Title VII and § 1981.

### A. Count I: Title VII violation by Auburn

Auburn argues that Wells-Marshall's Title VII claim fails as a matter of law under both the convincing mosaic analysis and the *McDonnell Douglas* framework because: (1) certain adverse acts are time-barred; (2) Wells-Marshall has not shown a convincing mosaic of discrimination; and (3) Wells-Marshall cannot show that her duty reassignment and contract non-renewal were pretextual. Each claim will be examined in turn.

### 1. Adverse Acts Prior to October 22, 2020

Defendants argue in their motion that Wells-Marshall complains of many adverse actions that are time barred. (Doc. 46-1 at 24–25.) In addressing this, Wells-Marshall argues that she has identified many discriminatory practices in her EEOC charge (such as her 2019 performance evaluation, the August 11, 2021 disciplinary writeup, and the October 21, 2020 disciplinary writeup), and therefore, the Court should examine more than just the decision to remove her as executive director, reassign her duties, and non-renew her contract, which the Defendants acknowledge as timely filed claims. (Doc. 47 at 15–16.) Yet, Wells-Marshall effectively concedes this argument on the next page of her response brief by only addressing the single decision on October 22, 2020 on her removal, reassignment, and non-renewal. (Doc. 47 at 16–17.) Therefore, the only adverse action properly before the Court is this decision. *See GolTV, Inc. v. Fox Sports Latin Am. Ltd.*, 277 F. Supp. 3d 1301, 1311 n.7 (S.D. Fla. 2017) ("When a party fails to respond to an argument or address a claim in a responsive brief, such argument or claim can be deemed abandoned."); *Cardwell v. Auburn Univ. Montgomery*, 941 F. Supp. 2d 1322, 1329 (M.D. Ala. 2013) (granting in part motion to dismiss for lack of subject matter jurisdiction after the plaintiff effectively conceded an argument by failing to respond to it in the responsive brief).

9

## 2. Convincing Mosaic

A plaintiff-employee can survive summary judgment on a Title VII or § 1981 claim by presenting "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).[3] *See also Tynes*, 88 F.4th at 946 (discussing the multiple methods of analyzing employment discrimination claims). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (internal quotation marks, footnote, and citation omitted).

A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) "systematically better treatment of similarly situated employees," and (3) pretext. *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*). An inference of racial discrimination "is not a suspicion or a guess. It is a reasoned,

---

[3] Wells-Marshall argues, in two throwaway paragraphs, that Defendant Wiley violated 42 U.S.C. § 1981 under a cat's paw theory of liability. (Doc. 47 at 18, 27.) Under a cat's paw theory, causation may be established if the plaintiff "shows that the decisionmaker followed the biased recommendation [of a recommender] without independently investigating the complaint against the employee." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.* Wells-Marshall argues that "Auburn's removal of Wells-Marshall from the position of Executive Director of the FCCP was caused by the racial bias, actions, and recommendation by Def. Wiley." (Doc. 47 at 27.) But much like the rest of her response brief, Wells-Marshall is heavy on conclusory allegations and light on evidence. She cites to no evidence that supports her assertion, nor case law aside from the *Stimpson* case, which is used only to show what a cat's paw theory entails. And the Court will not comb through the record for such evidence. *See Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("Making district courts dig through volumes of documents and transcripts would shift the burden of sifting from petitioners to the courts. . . . [A] district court cannot be expected to do a petitioner's work for [her].").

logical decision to conclude that a disputed fact exists on the basis of another fact." *Smith*, 644 F.3d at 1328 n.25 (internal quotation marks and citation omitted).

### a. Suspicious Timing, Ambiguous Statements, and Other Information From Which Discriminatory Intent May Be Inferred

Auburn first argues that there is no evidence of suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred. Wells-Marshall does not respond to this contention, perhaps because there is no evidence of any suspicious timing or ambiguous statements.

As the record reveals, DHR repeatedly complained about Wells-Marshall's communication style and professionalism over the course of approximately a year and notified Wiley that the contract was in jeopardy, and that Wiley repeatedly counseled Wells-Marshall on her communication and professionalism issues during that same period and even put her on an improvement plan. Then, when there appeared to be no improvement, and with continued complaints from DHR, Wells-Marshall's job duties were reassigned, and she was notified that her contract as the executive director would not be renewed. None of this timing is suspicious. And Wells-Marshall does not appear to attack it.

Wells-Marshall does argue that Wiley "disciplined employees differently based upon their race[.]" (Doc. 47 at 20.) She broadly argues that black employees in the FCCP program were not disciplined the same way as white employees. Specifically, "instead of holding white employees accountable for doing the work that needs to be done to . . . keep the contract in compliance, it was [Wells-Marshall's] leadership style that was the problem and not that employees weren't doing the things necessary for us to keep the contract in compliance." (Doc. 43-1 at 160:12–162:18 (discussing the 2019 performance evaluation).) But Wells-Marshall does not identify in her brief which employees were treated differently on account

11

of their race.[4]  (*See* doc. 47 at 9–10, 18.)  And the Court is not "expected to do a petitioner's work for [her]" by digging through the record.  *Chavez*, 647 F.3d at 1061.

Wells-Marshall also points to her own experience as evidence of racial discrimination.  She argues that she was held to a different standard than other white employees when it came to her communication issues.  Specifically, she cites to an email she received from Wiley following an email Wells-Marshall sent to FCCP staff after the June 29, 2020 meeting with DHR, in which Wells-Marshall stated that "[f]ailure to meet performance expectations will result in disciplinary action through [Auburn] HR." (Doc. 46-2 at 249:15–250:12; Doc. 43-1 at 190.)  In response and because of the tone and message of the email, Wiley emailed Wells-Marshall asking her to "please pay special attention to written communication with your staff.  Overtly negative and threatening emails are unlikely to encourage the kind of teamwork we desperately need to get us through this [30-day cure] crisis." (Doc. 43-1 at 195.)

According to Wells-Marshall, Wiley's comment was discriminatory and was an effort to create a paper trial to support Wells-Marshall's termination or contract non-renewal.  But her perception of Wiley's email is just that—a perception.  Nothing in this email is overtly racial in nature.  And while Wells-Marshall may perceive this as discriminatory, she provides nothing more than this belief.  *See Smith*, 644 F.3d at 1328 n.25 (An inference of racial discrimination "is not a

---

[4] In her response brief, Wells-Marshall spends fourteen pages applying case law to the facts of this case.  Yet, she only cites to the record twice.  It is a common trend in her briefing to merely provide a statement with no evidentiary support.  The Court specifically warned against this in its Scheduling Order. (Doc. 31 at 2.)  "In all briefs filed by any party relating to the [dispositive] motion, the discussion of the evidence in the brief must be accompanied by a specific reference, by page and line, to where the evidence can be found in a supporting deposition or document.  Failure to make such specific reference may result in the evidence not being considered by the Court." (*Id.*)

12

suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact." (internal quotation and citations omitted)). Simply put, this is not evidence of discriminatory intent.

This analysis leads to one conclusion: Wells-Marshall has not provided evidence related to suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred. *See Lewis II*, 934 F.3d at 1185.

### b. Comparators

If Wells-Marshall could provide comparators—that is, similarly situated individuals of other races that were treated more favorably—that could evidence disparate treatment. She identifies three potential comparators by name in her response brief—Wiley, Miller, and Dr. Akande, a black female faculty member in the Department of Human Development and Family Services. (Doc. 47 at 6, 10, 21.) But these are not valid comparators.

To be similarly situated to the plaintiff, the employee must have engaged in similar conduct or misconduct, be subject to the same employment policies or guidelines, will ordinarily have been under the jurisdiction of the same supervisor, and will share the plaintiff's employment or disciplinary history. *Lewis v. City of Union City*, 918 F.3d 1213, 1227–28 (11th Cir. 2019) (*Lewis I*) (en banc). "[A] valid comparison will turn not on formal labels, but rather on substantive likenesses." *Id.* at 1228.

Wiley and Miller have no history of similar conduct or complaints. Regardless of whether Wiley and Miller were responsible for the problems the FCCP program was facing when Wells-Marshall was hired, Wells-Marshall presents no evidence that Auburn had received complaints about their communication or professionalism from other employees at Auburn, or from outside organizations such as DHR, or that Auburn's grant status was in jeopardy because of them. And the same is true for Dr. Akande, who did not even work in the FCCP program let alone

oversee any large, multi-grant program like the FCCP. (Doc. 48-2 at ¶ 4.) Moreover, Dr. Akande is a black female, meaning she is placed in the same protected class as Wells-Marshall, and cannot be a valid comparator. (Doc. 48-2 at ¶ 1.) In short, Wiley, Miller, and Dr. Akande are not valid comparators and, as a result, Wells-Marshall has not provided a convincing mosaic tile of systematically better treatment of similarly situated employees. *See Lewis II*, 934 F.3d at 1185.

### c. Pretext

Another consideration in the mosaic analysis is pretext. *See Lewis II*, 934 F.3d at 1185. To show pretext, Wells-Marshall must "(i) cast[] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct, (ii) show[] that the employer's articulated reason is false and that the false reason hid discrimination, or (iii) establish[] that the employer has failed to clearly articulate and follow its formal policies." *Id.* at 1186.

Auburn has provided a valid nondiscriminatory reason for why Wells-Marshall's duties were reassigned and her contract non-renewed—DHR repeatedly complained about Wells-Marshall over a several month period and notified Auburn that it was considering cancelling both grants due to Wells-Marshall. (*See* Doc. 43-2 at 76:13–78:18, 86:16–97:3, 99:1–100:7, 119:12–122:4; Doc. 43-3 at ¶¶ 36–44.) Wells-Marshall concedes that these are valid, non-discriminatory reasons for reassigning her duties and nonrenewing her contract.

Nevertheless, she argues that "[t]here are factual disputes about Auburn's reasons[.]" (Doc. 47 at 20.) She again argues, without evidentiary support, that she was made to "accept the blame" for the failures of previous directors. But such a statement is conclusory and fails to "meet . . . head on and rebut" the legitimate, nondiscriminatory reason for reassignment and non-renewal. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc); *Carlisle v. Rhodes &*

14

*Rhodes Fam. Dentistry*, No. 22-13901, 2024 WL 621421, at *5 (11th Cir. Feb. 14, 2024) ("The plaintiff cannot merely make conclusory allegations and assertions" and survive summary judgment) (citing to *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)).  And even if Wells-Marshall's treatment was overly harsh or unfair, as she argues, this does not constitute sufficient evidence of pretext.  *See Thomas v. Auburn Univ.*, No. 3:21-cv-192-RAH, 2023 WL 7190506, at *10 (M.D. Ala. Nov. 1, 2023).  An employer may reassign an employee for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all," so long as that "action is not for a discriminatory reason." *Flowers v. Troup Cnty. Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (internal quotation marks and citation removed).

      Wells-Marshall further argues that she has shown pretext because she can show that she did not violate any Auburn rules.  But she does not explain which rules she did not break, nor does she point to any evidence to support her argument.  Even assuming, in the light most favorable to Wells-Marshall, that she did not violate any specific Auburn rule or policy, she still has not presented sufficient evidence showing a question of fact on the issue of pretext.  Indeed, it is clear that Wiley, HRL Leanne Marshall, Dean Hubbard, and then-Associate Provost Winn believed that Wells-Marshall's poor communications and failures to comply with DHR directives were jeopardizing the FCCP grants, that she had been repeatedly counseled about her communication and professionalism issues, and that DHR had notified Auburn that the grant program was in jeopardy because of Wells-Marshall. (Doc. 43-3 at ¶¶ 35–44.)

      And Wells-Marshall even acknowledges that DHR believed she was "combative."  (*See* Doc. 46-2 at 231:13–19.)  While Wells-Marshall, from her perspective, disputes that she was combative, this assertion does not "refute that [Defendants] held an honest belief that she engaged in . . . hostile behavior."

15

*Carlisle*, 2024 WL 621421 at *6. As such, she has not shown a question of fact on the issue of pretext.

### 3. *McDonnell Douglas*

The convincing mosaic is only one method used when analyzing a Title VII or § 1981 claim. An employee may also, and usually does, use the traditional *McDonnell Douglas* burden-shifting framework. Auburn argues its entitlement to summary judgment under this framework too.

To make a *prima facie* case under the *McDonnell Douglas* framework, a plaintiff asserting a race discrimination claim under either statute must show that: (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly-situated employees outside of her class more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Lewis I*, 918 F.3d at 1220–21. If the plaintiff succeeds in making out a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981); *Lewis I*, 918 F.3d at 1221. If an employer meets its burden of articulating a non-discriminatory reason for any purportedly adverse action, "to avoid summary judgment[, the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clerk, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993). A reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).

It is apparent that Wells-Marshall cannot make a *prima facie* case under *McDonnell Douglas* because she cannot show that Auburn treated similarly situated employees outside of her class—Wiley and Miller—more favorably. As stated above, Wiley and Miller do not have the same allegations of conduct as Wells-

Marshall despite serving in the same role as her. This is fatal to Wells-Marshall's claim under the *McDonnell Douglas* framework. *See Lewis I*, 918 F.3d at 1227 (A similarly situated comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff[.]").

It is likewise apparent that even if Wells-Marshall made a *prima facie* case under *McDonnell Douglas*, she cannot rebut the legitimate, non-discriminatory reason Auburn has provided for removing her as executive director, reassigning her duties, and non-renewing her contract. As stated above, Wells-Marshall does not provide any evidence-backed argument that Auburn acted with pretext. (*See* doc. 47 at 21–23.) And to rebut Auburn's legitimate, non-discriminatory reason, Wells-Marshall must "address it head on[.]" *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1308 (11th Cir. 2023) (internal quotation marks and citation omitted). She "cannot rebut a reason by simply quarreling with the wisdom of it." *Id.* at 1308 (internal quotation marks and citation omitted). Instead, Wells-Marshall "must point to the weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the justification." *Id.* (internal quotation marks and citation omitted). And here, Wells-Marshall simply quarrels with the rationale for her removal and reassignment, failing to point to the record where the Court can find evidence of pretext. In other words, she has not carried her burden.

### B. Wells-Marshall's § 1981 Claim against Wiley

Title 42 U.S.C. § 1981 prohibits racial discrimination in the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. Both Title VII and § 1981 have the same burden of proof and use an identical analytical framework. *Berry*, 84 F.4th at 1307. And, in addition to the Title VII framework requirements, to prevail on a § 1981 claim, Wells-Marshall must "bear[] the burden

17

of showing that race was a but-for cause of [her] injury." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020).

Wells-Marshall's § 1981 claim against Wiley is based on the same reassignment and contract non-renewal decisions made the basis of Wells-Marshall's Title VII claim against Auburn. As discussed above, Wells-Marshall is unable to establish a Title VII claim under either the *McDonnell Douglas* framework or by showing a convincing mosaic of discrimination. And even if she had proven a Title VII claim, she still is unable to show that race is the but-for cause of her reassignment and non-renewal. To prevail, Wells-Marshall must show that had she been white, she would still be executive director. *See Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1014 (11th Cir. 2023). The record is devoid of evidence that race played any role, much less a determinative role, in Wiley's recommendation to reassign her duties and not renew her contract. Wells-Marshall's belief that Wiley discriminated against her on the basis of race will not prevail absent evidence. *Id.* at 1018 ("[T]o infer . . . without any other evidence is nothing but speculation. . . . [A] reasonable jury could not . . . conclude that [Wells-Marshall's] race was a but-for cause of [her] termination.").

Therefore, Wiley is due to be granted summary judgment in her favor on the § 1981 claim against her.

### VI.  CONCLUSION

For the reasons stated, it is **ORDERED** that Defendants' Motion for Summary Judgment (doc. 43) is **GRANTED.** A separate Final Judgment will be entered.

**DONE** on this the 6th day of June, 2024.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE